IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALICE F. BENNETT, BRAELYNN YOUNG, a minor and individually on behalf of his mother, AMANDA YOUNG and BOBBY BENNETT<br><br>　　　Plaintiffs,<br><br>vs.<br><br>ALEXANDER PRICE, TRANSAM TRUCKING, INC., and CAROLINA CASUALTY INSURANCE COMPANY,<br><br>　　　Defendants. | CIVIL ACTION<br>FILE NO.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR DAMAGES

COMES NOW, Plaintiffs, Alice F. Bennett, Braelynn Young, a minor and individually on behalf of his mother, Amanda Young and Bobby Bennett and files their Complaint For Damages against Defendants Alexander Price, Transam Trucking, Inc. and Carolina Casualty Insurance Company, respectfully showing the Court as follows:

## PARTIES, JURISDICTION AND VENUE

1.

Plaintiffs are residents of the State of Georgia.

2.

Alexander Price is an adult resident of Suwanee County Florida.  Service of process may be perfected on Alexander Price by delivering a copy of the summons and complaint to him personally or by leaving the same at his usual place of abode with someone of suitable age and discretion then residing therein, which is 18458 211th  Drive, Live OaCTk, FL 32060.

3.

Transam Trucking is a nonresident motor carrier who transacted business in the State of Georgia at the time of the subject incident and at the time of the filing of this Complaint.  Transam Trucking's registered agent is The Financial Integrity Group, c/o Dawn Richardson, 410 East Taylor Street, Suite G, Griffin, Georgia 30223 in Spalding County.

4.

Carolina Casualty Insurance Company, is a foreign profit corporation at the time of the subject incident and at the time of the filing of this Complaint that and transacts business in the State of Georgia.  Carolina Casualty Insurance Company's registered agent is Amelia Garner, who may be served c/o CT Corporation 1201 Peachtree Street, NE, Atlanta, Georgia 30361, Fulton County.

5.

Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C.A. § 1332.

## **PARTIES**

6.

Upon information and belief, at all times pertinent to this case, Alexander Price was an agent of Transam Trucking, and at the time of the incident herein complained of, was acting within the course and scope of his employment with Transam Trucking.  As part of this business, Transam Trucking owned or otherwise controlled a 2017 Kenworth T680 with a VIN of 1XKYDP9X4HJ135962.

7.

Transam Trucking is liable for the acts and omissions of its employees and agents, including Alexander Price, under the doctrine of respondent superior and other applicable theories of principal/agency law, including ostensible and/or apparent agency.

8.

Transam Trucking is vicariously liable for the tortious act or omission committed by its employee, Alexander Price, within the course and scope of his employment with Transam Trucking.

9.

At the time of the subject incident, Transam Trucking held a policy for automobile insurance coverage through Carolina Casualty Insurance Company under Policy Number 5010512 and this direct action against this insurer is proper pursuant to  OCGA § 40-2-140 (d) and/or  OCGA § 40-1-112 (c) .

10.

At all times relevant to this Complaint Transam Trucking owned, operated, controlled the operations, planning and management, budgeting, staffing, and quality control of Transam Trucking, its agents, servants and employees and is directly liable for its own independent misconduct.

11.

Transam Trucking operates as a commercial motor carrier bearing USDOT Number 315503 and is authorized to transport motor vehicles in interstate commerce.

12.

Transam Trucking operates 828 power units in total, with its principal place of business being the State of Kansas, but with substantial and significant contacts that transverse the public roadways of Georgia.

13.

Upon information and belief, Alexander Price was operating a commercial motor vehicle under the authority of Transam Trucking, and was otherwise working in the course and scope of his employment and for the benefit of Transam Trucking.

## **FACTS**

14.

The wreck that is the subject of this Complaint occurred in Oconee County, State of Georgia on or about February 1, 2021, at 1:56 p.m., when Alexander Price collided with the rear end of the car in which plaintiffs were travelling.

15.

Since the time of the collision, Plaintiffs have suffered the following injuries and damages:

a)     extensive pain, mental anguish, suffering and discomfort;

b)     disability for a period of time, past and future;

c)     money spent for medical care and treatment, past, present and future;

d)     inability to carry on normal activities;

e)     permanent injuries and partial disability;

f)     emotional trauma and distress;

g)     loss of enjoyment of life; and,

h)    time and wages lost from work.

## FIRST CAUSE OF ACTION

**(Against Alexander Price)**
**Commercial Motor Vehicle Negligence**

16.

Plaintiffs repeat and reallege as if verbatim paragraphs 1- 15.

17.

At all times relevant to this Complaint, Alexander Price was operating a commercial motor vehicle transporting motor vehicles in intrastate or interstate commerce.

18.

In order to undertake such actions, Alexander Price must have the knowledge and skills necessary for the safe operation of the commercial motor vehicle.

19.

The safe operation of commercial motor vehicles requires specialized knowledge, skills, and additional training not necessary for the safe operation of passenger vehicles because:

a)    Commercial motor vehicles are heavier than passenger vehicles and take longer to stop, as compared to passenger car operating at the same pre breaking speed, which changes the principles and procedures

necessary to keep a proper lookout and to maintain a safe speed under the circumstances;

b)      commercial motor vehicles are heavier and longer than passenger vehicles, take longer to execute turning and lane change maneuvers, and have articulating trailers, as compared to passenger vehicles operating at the same pre turn or lane change speed, which changes the principles and procedures necessary to execute safe turning, lane change, and backing maneuvers;

c)      Commercial motor vehicles are heavier than passenger vehicles and cause more significant property damage and/or personal injury or death in collisions, as compared to passenger cars operating at the same pre collision speed and trajectory;

d)      Commercial motor vehicles utilize brakes, which have a delay in actuation following pedal depression not found in passenger vehicles, which changes the total stopping distance of commercial vehicles and changes the principles and procedures necessary to safely stop a commercial vehicle; and,

e)      Commercial motor vehicles pose more of a risk of causing personal injury, death, or property damage in a collision, as compared to a

collision involving a passenger vehicle operating at the same pre collision speed and trajectory.

20.

In order to undertake the safe operation of a commercial motor vehicle, Alexander Price must have knowledge in many areas, including the following:

a) The procedures for safe vehicle operations;

b) the proper procedures for performing basic maneuvers such as slowing for traffic conditions;

c) the importance of conducting a proper visual search;

d) the importance of proper visual search methods, including seeing ahead and along the sides;

e) the principles and procedures for proper communications and the hazards of failing to signal properly, including signaling intent and communicating presence;

f) the importance of understanding the effects of speed, including speed and visibility, and speed and stopping distance;

g) the procedures and techniques for controlling the space around the vehicle, including the importance of space management, space cushions, and controlling space ahead; and,

h)      the basic information concerning when and how to make emergency maneuvers, including evasive steering, emergency stopping, and off-road recovery.

21.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to make regular checks of their mirrors to be aware of traffic and keep a proper lookout for slowed traffic ahead.

22.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that to be a safe driver, you need to know what's going on in front of and around your vehicle.

23.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that not maintaining a proper lookout is a major cause of accidents.

24.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to look ahead but many don't look far enough.

25.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to look 12 to 15 seconds ahead.

26.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, a standard in the industry for drivers is to understand that failing to reduce one's speed for present traffic conditions is a major cause of fatal crashes; Therefore, commercial drivers must adjust their speed depending on driving conditions.

27.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand their vehicle's total starting and stopping distance at any given speed.

28.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that they should always be able to stop and stop in the distance you can see ahead.

29.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers should understand that of all the space around your vehicle, the space you are driving into is the most important.

30.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that you need space ahead in case you must stop suddenly.

31.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand the importance of seeing hazards, that may present a possible danger. Reasonably safe commercial drivers understand that seeing hazards lets you be prepared and that you will have more time to act if you see hazards before they become emergencies.

32.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that there are often clues that will help you see hazards.

33.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to always be looking for potential hazards in order to have time to plan a way out of any emergency.

34.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to think about what emergencies could develop when they see potential hazards and to figure out how to handle them. Reasonably safe commercial drivers are always prepared to take action based on their plans; in this way, they will be a prepared, defensive driver.

35.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand the dangers of distracted driving – anything that takes your attention from driving. Reasonably safe drivers understand that whenever you are driving a vehicle and your full attention is not on the driving task, you put other vehicles and lives in danger.

36.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that the

additional risk of mountainous driving is that drivers caught off guard are less able to avoid a crash.

37.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to drive slowly enough to be sure you can start and stop in the distance you can see ahead.

38.

In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand the dangers of overdriving the road's terrain.

39.

The injuries and damages incurred by Plaintiffs were directly and proximately caused by the Alexander Price's careless, negligent, willful and/or wanton acts in one or more of the following particulars:

a)    In failing to properly maintain the tractor he operated;

b)    in failing to apply the brakes of the vehicle and/or maintain them in proper working condition;

c)    in failing to steer or take other evasive action so as to avoid the collision;

d)    in failing to keep a proper lookout;

e)    in failing to apply his brakes as required by law;

f)    in operating the vehicle too fast for existing conditions;

g)    in failing to observe the condition of traffic ahead;

h)    in operating a commercial motor vehicle when he was not qualified to do so;

i)    in failing to follow the proper procedures for safe commercial vehicle operations;

j)    in failing to have the requisite knowledge and skill regarding the procedures for safe commercial motor vehicle operations;

k)    in failing to have the requisite knowledge and skill regarding the proper procedures for performing basic maneuvers such as stopping;

l)    in failing to have the requisite knowledge and skill regarding the importance of conducting a proper visual search and in conducting an improper visual search;

m)    in failing to have the requisite knowledge and skill regarding the importance of proper visual search methods, including seeing ahead, and in conducting an improper visual search ahead;

n)    in failing to have the requisite knowledge and skill regarding the principles and procedures for proper communications and the hazards of failing to slow his vehicle, including signaling intent and

communicating presence, and failing to communicate his presence and location;

o)      in improperly communicating his intent, presence, and location;

p)      in failing to have the requisite knowledge and skill regarding the importance of understanding the effects of speed, including speed and visibility, speed and stopping distance, and speed and visibility;

q)      in operating his commercial vehicle at an improper speed given his visibility and stopping distance;

r)      in failing to have the requisite knowledge and skill regarding the procedures and techniques for controlling the space around the vehicle, including the importance of space management, space cushions, controlling space ahead;

s)      in operating his vehicle without the proper space management, including space cushions, and improperly controlling space ahead;

t)      in failing to have the requisite knowledge and skill regarding the preparations and procedures for the terrain in which he was driving, such as vision, fatigue, and inexperience; roadway factors, including low illumination, variation in terrain, unfamiliarity with the roads, other road users; and vehicle factors;

u)      in failing to make regular checks of their mirrors to be aware of traffic;

v)     in failing to have the requisite knowledge and skill regarding the requirement to look 12 to 15 seconds ahead;

w)     in failing to have the requisite knowledge and skill regarding his vehicle's total stopping distance;

x)     in operating his vehicle at a speed that was too fast to be able to stop within the distance provided ahead;

y)     in failing to have the requisite knowledge and skill regarding the importance of seeing potential hazards;

z)     in failing to see a potential hazard before it became an emergency;

aa)    in overdriving the road's terrain;

bb)    in failing to operate his vehicle as a prepared, defensive driver;

cc)    in operating his vehicle while distracted; and,

dd)    in operating his vehicle while fatigued or tired.

40.

Alexander Price's careless, negligent, willful, wanton, reckless and unlawful acts were the direct and proximate cause of the collision and resulting injuries and damages to Plaintiffs.

41.

Plaintiffs are informed and believe that they are entitled to judgment against Alexander Price for damages in excess of $75,000.

## SECOND CAUSE OF ACTION

### (Against Transam Trucking)
### Respondeat Superior/ Agency Principal Liability

42.

Plaintiffs repeats and realleges paragraphs 1- 40 as if verbatim.

43.

At all times relevant to the allegations contained in this Complaint, Alexander Price was working in the course and scope of his employment for Transam Trucking, or was otherwise acting as an agent or servant of Transam Trucking.

44.

Transam Trucking, is liable for the acts or omissions of Alexander Price under the doctrines of respondeat superior, master/servant, and/or agent/principal.

45.

At all times relevant to this Complaint, Alexander Price was operating a commercial motor vehicle in intrastate or interstate commerce under the USDOT authority granted to Transam Trucking.

46.

Transam Trucking is liable for the acts and omissions of Alexander Price while he was operating under its authority by virtue of the Federal Motor Carrier Safety Regulations.

47.

Plaintiffs are informed and believe that they are entitled to judgment against Defendants for damages in excess of $75,000.

**THIRD CAUSE OF ACTION**

**(Against Transam Trucking)**
**Negligence**

48.

Plaintiffs repeat and reallege as if verbatim paragraphs 1- 47.

49.

Transam Trucking operates as a commercial motor carrier.

50.

In return for the privilege to operate commercial motor vehicles on the public roadways, prospective motor carriers must make certain safety related certifications and verifications.

51.

Motor carriers such as Transam Trucking are required to submit a Form MCS-150 to the Federal Motor Carrier Administration and obtain an USDOT number.

52.

Each Form MCS-150 Transam Trucking submitted or will submit contains a Certification Statement whereby Transam Trucking declares under the penalty of perjury that it is familiar with the Federal Motor Carrier Safety Regulations and/or Federal Hazardous Materials Regulations.

53.

Motor Carriers such as Transam Trucking, are required to submit a Form OP-l to the Federal Motor Carrier Administration in order to gain interstate operating authority.

54.

The Form OP-l submitted by Transam Trucking, contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they are subject to the pertinent portions of the U.S. DOT's Federal Motor Carrier Safety Regulations ("FMCSR") at 49 CFR, Chapter 3, Subchapter B (Parts 350-399).

55.

The Form OP-l submitted by Transam Trucking, contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they have access to and are familiar with all applicable U.S. DOT regulations relating to the safe operation of commercial vehicles and that they will comply with the regulations.

56.

Each Form OP-l submitted by Transam Trucking contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that, at a minimum, they:

a)      have in place a system and an individual responsible for ensuring overall compliance with the FMCSR;

b)      can produce a copy of the FMCSR;

c)      have in place a driver safety training/orientation program;

d)      are familiar with DOT regulations governing driver qualifications and have in place a system for overseeing driver qualification requirements (49 CFR Parts 391); and,

e)      have in place policies and procedures consistent with DOT regulations governing driving and operational safety of motor vehicles.

57.

Reasonably safe motor carriers develop and implement policies, practices, and procedures to give effect to the minimum safety standards contained in the Federal Motor Carrier Safety Regulations to reduce or eliminate preventable collisions that may cause injury, death, or property damage on the public roadways.

58.

Reasonably safe motor carriers train and educate their drivers regarding the safe operation of commercial motor vehicles.

59.

Reasonably safe motor carriers utilize information and training materials from industry associations and third-party safety vendors such as J.J. Keller & Associates, Inc., the "Smith System," or the National Safety Council to train and educate their drivers regarding the safe operation of commercial motor vehicles.

60.

The safe operation of commercial motor vehicles includes practices and procedures related to speed management, space management, seeing ahead, total stopping distance, nighttime driving, hazard perception, accident countermeasures, and fatigue and distracted driving awareness.

61.

Reasonably safe motor carriers utilize publicly available government, industry, and trade publications regarding the preventability of highway collisions to design, develop, and implement safety management controls which are designed to reduce collisions involving commercial motor vehicles.

62.

Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

63.

To be qualified to operate a commercial motor vehicle, a driver must have experience and/or training to safely operate the type of vehicle; must be physically qualified; must have a currently valid CDL, and must furnish the motor carrier a list of current driving violations.

64.

To operate a commercial motor vehicle under Transam Trucking's, operating authority, the prospective driver is required to complete a written application containing the following information:

a)     the nature and extent of the driver's experience;

b)     a list of all accidents in the previous 3 years;

c)     a list of all violations of motor vehicle laws in the previous 3 years;

d)     a detailed description of any denial, revocation, or suspension of any drivers licenses or permits;

e)     employment information for the previous 3 years; and,

f)   the names of all employers for whom the driver has operated a commercial motor vehicle for the previous 7 years.

65.

Before a motor carrier such as Transam Trucking may allow or permit a driver to operate a commercial motor vehicle under its operating authority, the motor carrier must:

a)   obtain the driver's motor vehicle record from the applicable state agency for the previous 3 years; and,

b)   investigate the driver's safety performance history with all DOT regulated employers for the previous 3 years;

66.

Once a motor carrier such as Transam Trucking hires a commercial driver, every twelve months thereafter the driver must submit a written list of all traffic violations the driver received in those twelve months.

67.

Once a motor carrier such as Transam Trucking hires a commercial driver, every twelve months thereafter the motor carrier must obtain from the relevant state agency a list of traffic violations for the previous year and maintain a copy of the record in the driver's qualification file.

68.

Motor carriers such as Transam Trucking are required to maintain a Driver Qualification File meeting the requirements of 49 CFR § 391.51 for the duration of the driver's employment with the motor carrier plus three years.

69.

In addition, drivers employed by, or operating under the authority of, motor carriers such as Transam Trucking, are required to complete and turn in to their employer trip envelopes at least every 13 days. Such trip envelopes include, but are not limited to, the driver's daily Record of Duty Status logs and pre-trip and post-trip vehicle inspection reports.

70.

Drivers' daily logs record how much time each driver spends on duty, on duty not driving, off duty, and in a sleeper birth. Driver logs also require drivers to indicate how many miles they drove during each 24-hour period and their locations at each change of duty status.

71.

In addition to the required daily logs and vehicle inspection reports, it is standard in the industry for motor carriers also to collect information from their drivers, such as fuel receipts, entry and departure records, and other supporting documentation that verifies the times that their drivers were at specific locations.

72.

In addition to the required daily logs, vehicle inspection reports, and supporting documentation, reasonably safe motor carriers utilize available technology such as GPS tracking systems and in cab communications systems to monitor the safety performance of their drivers.

73.

It is standard in the industry for motor carriers to use the information contained in the required daily driver logs, vehicle inspection reports, and other supporting documents to audit the safety performance of their drivers.

74.

It is also standard in the industry for motor carriers to use any additional information, such as in-cab communications and GPS tracking to audit the safety performance of their drivers.

75.

It is standard in the industry for motor carriers to use the information contained in the required daily driver logs, vehicle inspection reports, and other supporting documentation to audit the safety performance of their drivers to ensure that their drivers are not violating hour of service rules, to ensure that their drivers do not average speeds in excess of what is safe, and otherwise verify that the information contained in the driver's logs is accurate and truthful.

76.

Auditing drivers' daily logs, vehicle inspection report, supporting documents, in-cab communications, and GPS tracking information increases the likelihood that a motor carrier's drivers are operating their commercial vehicles safely and decreases the risk of a preventable crash.

77.

Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver is not qualified to do so.

78.

Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, in-cab communications, and GPS tracking information indicates that the driver has a higher than safe average speed.

79.

Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, in-cab communications, and GPS tracking information indicates that the driver operates his vehicle in violation of the hours of service rules.

80.

Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, in-cab communications, and GPS tracking information indicates that the driver is not accurate and truthful in the completion of his logs.

81.

Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

82.

It is standard in the industry for careful motor carriers to regularly check their Safety Measurement System details.

83.

The FMCSA's Safety Measurement System (SMS) provides an assessment of a motor carrier's on-road performance results within seven safety related categories. Motor carriers are scored on a percentile basis as compared to other similar carriers.

84.

It is standard in the industry for motor carriers to regularly monitor their SMS scores and to address any areas of noncompliance before they lead to collisions.

85.

The injuries and damages incurred by the Plaintiffs and were directly and proximately caused by Transam Trucking's careless, negligent, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars by failing to use reasonable care in the:

a) failing to design, develop, and implement adequate safety management controls related to speed management, space management, seeing ahead, total starting distance, nighttime driving, hazard perception, accident countermeasures, and/or fatigue and distracted driving awareness.

b) failing to train Alexander Price regarding speed management, space management, seeing ahead, total starting distance, nighttime driving, hazard perception, accident countermeasures and fatigue and distracted driving awareness;

c) failing to properly monitor and supervise the driving habits of Alexander Price;

d) Supervision of its business operations in failing to properly monitor the driving habits and records of its drivers, employees, and/or agents, specifically Alexander Price;

e)      Supervision of its drivers, employees, and/or agents, specifically the

        Alexander Price;

f)      Instruction of its drivers, employees, and/or agents, specifically

        Alexander Price;

g)      Entrustment of a tractor trailer to its drivers, employees, and/or

        agents, specifically Alexander Price;

h)      Compliance with federal and/or state regulations and industry

        standards, as referenced in this Complaint and as developed during the

        discovery in this case;

i)      Improperly auditing the logs and supporting documentation of its

        drivers, employees, and/or agents, specifically Alexander Price;

j)      Failing to utilize available information and technology to properly

        monitor its drivers, employees, and/or agents, specifically Alexander

        Price for compliance with company polices and/or state and federal

        regulations;

k)      In allowing Alexander Price to operate a commercial motor vehicle

        despite knowledge of his inability to do so safely;

l)      In failing to have adequate safety management controls in place to

        ensure       compliance with the required safety fitness standard;

m)      in failing to budget an appropriate amount of money to design,

develop, and implement safety management controls in the areas of

speed management, space management, seeing ahead, total stopping

distance, nighttime driving, hazard perception, accident

countermeasures and fatigue and distracted driving awareness; and,

n)      In failing to utilize available technology to monitor and audit the

safety performance of its driver's including Alexander Price.

86.

Transam Trucking's careless, negligent, willful, wanton, reckless and
unlawful acts were the direct and proximate cause of the collision and resulting
injuries and damages to Plaintiffs.

## FOURTH CAUSE OF ACTION
## Punitive Damages

87.

Plaintiffs repeat and reallege as if verbatim paragraphs 1- 86.

88.

Defendants' actions, individually and/or jointly and severally, in this case
demonstrate willful misconduct, malice, wantonness, oppression, and that entire
want of care which raises the presumption of conscious indifference to
consequences.

89.

In failing to implement, follow, or utilize proper procedures to evaluate and monitor Alexander Price's qualifications for the operation of the subject truck, in violation of federal statutes, and Georgia law, Defendant Transam Trucking has demonstrated an entire want of care sufficient to raise the presumption of conscious indifference to consequences.

90.

In failing to implement, follow, or utilize proper procedures to properly maintain the subject truck, in violation of federal statutes and Georgia law, Defendant Transam Trucking has demonstrated an entire want of care sufficient to raise the presumption of conscious indifference to consequences.

91.

Plaintiffs are entitled to an award of punitive damages against Defendants in order to punish Defendants and/or deter them from repeating their wanton, reckless and consciously indifferent conduct in an amount to be determined by a jury.

## FIFTH CAUSE OF ACTION
### Attorneys' Fees

92.

Plaintiffs repeat and reallege as if verbatim paragraphs 1- 91.

93.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs undue expense.   Thus, Plaintiffs are entitled to recover their necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11, as well as any other statutory or common law basis.

**SIXTH CAUSE OF ACTION**
**Contract**

94.

Plaintiffs repeat and reallege as if verbatim paragraphs 1- 93.

95.

At the time of the collision-in-suit Defendant Carolina Casualty Insurance Company had issued a policy of liability insurance, Policy Number 5010512, naming Transam Trucking as an insured.

96.

Carolina Casualty Insurance Company Policy Number 5010512 was in effect on February 1, 2021 and provides coverage of at least $1,000,000.00 for the negligent acts and omissions of Transam Trucking.

97.

Defendant Carolina Casualty Insurance Company is subject to suit by direct action pursuant to the provisions of O.C.G.A. § 40-1-112(c) and under the old statute in place at the time of this incident O.C.G.A. § 46-7-12(c) (2011).

98.

Pursuant to the terms and conditions of its policy of insurance and applicable Georgia law, Defendant Carolina Casualty Insurance Company is liable to Alice F. Bennett, Braelynn Young, a minor individually and by his Mother Amanda Young and Bobby Bennett are responsible for payment of damages incurred by and occasioned upon the Plaintiffs as a result of the negligent acts and omissions of Alexander Price and Transam Trucking.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays:

a)      That summons, issue and process be served upon Defendants;

b)      That Plaintiffs have a trial by a jury of 12 persons;

c)      That Plaintiffs recover from Defendants an amount for their past special and actual damages in an amount in excess of $75,000;

d)      That Plaintiffs recover from Defendants an amount to compensate them for their future medical and other expenses, the exact amount of which will be determined at trial;

e)     That Plaintiffs recover from Defendants an amount for their general and compensatory damages, the exact amount of which will be determined at trial;

e)     That Plaintiffs recover punitive damages from Defendants in an amount to be determined at trial;

f)     That Plaintiffs recover their costs and expenses, including attorneys' fees, in bringing this action from Defendants; and

g)     That Plaintiffs have such other and further relief as this Court may deem just and proper.

This the 19th day of October, 2021.

Respectfully submitted,

BY:    /s/Charles H. McAleer
       Charles H. McAleer, Esq.
       Georgia Bar No.  480098
       Attorney for Plaintiff

Morgan & Morgan Atlanta, PLLC
P.O. Box 57007
Atlanta, GA 30343-1007
Tel: (404) 965-1687
E-mail: cmcaleer@forthepeople.com